### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DISTRICT AT CINCINNATI

| | |
|---|---|
| **KRISTEN BECKER f.k.a. KRISTEN STITSINGER**,<br>8509 Forest Valley Dr.<br>Cincinnati, OH 45247<br><br>and<br><br>**FREDERICK STITSINGER**,<br>1285 Morman Rd.<br>Hamilton, OH 45013<br><br>          Plaintiffs,<br><br>     vs<br><br>**PENNYMAC LOAN SERVICES, LLC**,<br>c/o CT Corporation System<br>4400 Easton Commons Way, Ste. 125<br>Columbus, OH 43219<br><br>          Defendant. | Case No.<br><br>Judge<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY DEMAND ENDORSED HEREON** |

Plaintiffs Kristen Becker f.k.a. Kristen Stitsinger ("Becker") and Frederick Stitsinger ("Stitsinger") (collectively, "Plaintiffs"), through counsel, state as follows for their Complaint against Defendant PennyMac Loan Services, LLC ("PennyMac"):

### WHY PLAINTIFFS ARE BRINGING THIS CASE

1.     Becker has been trying to bring the mortgage she and Stitsinger have with PennyMac current, yet, like in the Lucy and Charlie Brown cartoon, every time Becker (Charlie Brown) paid what PennyMac told her to pay, PennyMac (Lucy) pulled the football away and allowed Becker to miss and fall flat on her back. Plaintiffs seek to clarify and determine once and for all the correct balance on the mortgage loan and to hold PennyMac accountable for Becker's frustrating experience.

**PARTIES, JURISDICTION, AND VENUE**

2.      Plaintiffs are the owners of residential real property located at and commonly known as 8509 Forest Valley Dr., Cincinnati, OH 45247 (the "Home").

3.      PennyMac is the servicer of a note executed by Plaintiffs (the "Note") and of a mortgage on the Home that secures said note (the "Mortgage") (collectively, the "Loan"). PennyMac serviced the Loan since April 1, 2015. The Loan is attached as **Exhibit 1**.

4.      Non-party Federal Home Loan Mortgage Corporation is the current owner of the Loan.

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA) and Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.* (RESPA).

6.      This Court has supplemental jurisdiction to hear all state law claims that are plead herein or that may subsequently arise pursuant to 28 U.S.C. § 1367.

7.      Venue lies in this District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

**SUMMARY OF CLAIMS**

8.      This action is filed to enforce regulations promulgated by the Consumer Financial Protection Bureau (CFPB) and implemented pursuant to 12 U.S.C. § 2605(f) that became effective on January 10, 2014, specifically, 12 C.F.R. § 1024.1, *et seq.* ("Regulation X").

9.      In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111-203, 124 Stat. 1376 (2010).

10. Specifically, on January 17, 2013, the CFPB issued the Real Estate Settlement Procedures Act Mortgage Servicing Final Rules, 78 F.R. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

11. Mortgage servicers are prohibited from failing "to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." 12 U.S.C. § 2605(k)(1)(C).

12. Mortgage servicers are prohibited from failing "to comply with any other obligation found by the [CFPB], by regulation, to be appropriate to carry out the consumer protection purposes of [RESPA]." 12 U.S.C. § 2605(k)(1)(E).

13. The Loan is a "federally related mortgage loan" as said term is defined by 12 C.F.R. § 1024.2(b).

14. Becker asserts claims for relief against PennyMac for violations of the specific rules under Regulation X, as set forth, *infra*.

15. Becker has a private right action under RESPA pursuant to 12 U.S.C. § 2605(f) for the claimed violations and such action provides for remedies including actual damages, statutory damages, and attorneys' fees and costs.

16. Plaintiffs assert a common law claim for breach of contract and statutory claims for violations of the Consumer Sales Practices Act, R.C. 1345.01, *et seq.* (CSPA) and the Residential Mortgage Lending Act, R.C. 1322.01, *et seq.* (RMLA).

## FACTUAL BACKGROUND

17. On February 6, 2015, Becker, with Stitsinger as co-signer, financed the Loan through non-party NVR Mortgage Finance, Inc. ("NVR") and agreed that property taxes and

3

hazard insurance for the Home would be paid through an escrow account maintained by the servicer of the Loan. NVR assigned the Mortgage to PennyMac on February 15, 2019.

18.     Becker has occupied the Home as her primary, principal residence at all times relevant to the Complaint.

19.     On February 6, 2015, Becker received an Initial Escrow Account Disclosure Statement from NVR stating that her monthly mortgage payment would be $1,691.80. A copy of the Initial Escrow Account Disclosure Statement is attached as **Exhibit 2**.

20.     From April 2015 to present, Becker has submitted a monthly payment to PennyMac for each month. From August 2016 to January 2018, Becker paid more than her scheduled mortgage payment to PennyMac each month.

21.     On February 23, 2015, PennyMac sent a notice of servicing transfer to Becker indicating that PennyMac would begin servicing the Loan effective April 1, 2015. A copy of the notice of servicing transfer is attached as **Exhibit 3**.

22.     According to the Initial Escrow Account Disclosure Statement, Becker's mortgage servicer was expected to pay property taxes in June 2015 in the amount of $1,284.55 and in January 2016 in the amount of $1,284.55. See Exhibit 2.

23.     According to PennyMac, a representative of PennyMac called the Hamilton County Auditor (the "Auditor") on May 31, 2015 to make the first property tax payment but was informed that the taxes were paid current.

24.     On January 7, 2016, PennyMac made a property tax payment in the amount of $552.40 for the first half of tax year 2015.

25.     According to PennyMac, on February 17, 2016, PennyMac sent Becker a check for $1,964.48 because it did not pay the property taxes as estimated by the Initial Escrow Account Disclosure Statement.

26.     On May 24, 2016, PennyMac made a property tax payment in the amount of $526.87 for the second half of tax year 2015.

27.     On January 9, 2017, PennyMac made a property tax payment in the amount of $554.79 for the first half of tax year 2016.

28.     On February 15, 2017, PennyMac sent Becker an escrow refund in the amount of $1,848.67.

29.     According to PennyMac, PennyMac received notice from the Auditor sometime in May 2017 that there was a prior tax delinquency.

30.     On May 18, 2017, PennyMac disbursed funds in the amount of $2,819.35 to the Auditor for the prior tax delinquency.

31.     Also on May 18, 2017, PennyMac made a property tax payment in the amount of $2,290.09 for the second half of tax year 2016.

32.     As PennyMac purportedly disbursed two escrow refunds for $1,964.48 and $1,848.67, Becker had previously paid PennyMac, through her monthly mortgage payments, more than enough to cover this delinquency.

33.     At this point, through no fault of her own, Becker owed $2,819.35 to PennyMac for escrow advances due to the tax issue.

34.     However, PennyMac did not inform Becker of the escrow issue until roughly nine months later, when she received an escrow account analysis dated February 14, 2018. A copy of the February 2018 Escrow Account Disclosure Statement is attached as **Exhibit 4**.

35.    PennyMac, through the February 2018 Escrow Account Disclosure Statement, claimed that Becker now had an escrow shortage of $7,035.66 and her new monthly mortgage payment would be almost $1,000.00 more than her previous monthly payment of $1,589.68.

36.    Instead of correcting this issue back in May 2017, PennyMac waited until February 2018 to inform Becker of the escrow issue and significantly raised her monthly mortgage payment.

37.    Becker was surprised by the significant shortage, especially considering that she had made her monthly mortgage payment every month and the fact that PennyMac recently sent an escrow refund. Becker repeatedly contacted PennyMac to attempt to understand what happened, however PennyMac failed to fully explain the issue to Becker until September 2018.

38.    On March 27, 2018, Becker made her April 2018 payment early. PennyMac, however, applied the entire amount to Becker's escrow account instead of correctly applying the payment to principal, interest, and escrow items in accordance with the terms of the loan and applicable law. On April 16, 2018, PennyMac then charged Becker a $60.03 late fee because of its improper application of the March 27, 2018 payment. On July 11, 2018, PennyMac applied Becker's July 2018 payment to a suspense account. Through these actions, PennyMac improperly placed Becker into a two-month delinquency.

39.    On or about June 19, 2018, PennyMac sent Becker another escrow account analysis. A copy of the June 2018 Escrow Account Disclosure Statement is attached as **Exhibit 5**.

40.    PennyMac, through the June 2018 Escrow Account Disclosure Statement, claimed that Becker was now $4,050.81 short on her escrow account and her new monthly mortgage payment would be $2,289.06.

41.    Despite Becker's attempts to work with PennyMac to correct the accounting on the Loan, PennyMac sent Becker Notices of Default and Intent to Accelerate (of note is the Notice of

Default and Intent to Accelerate dated July 26, 2018, wherein PennyMac indicates that $2,705.62 would cure the default). A copy of the Notices of Default and Intent to Accelerate are attached as **Exhibit 6**.

42.     On August 8, 2018, Becker contacted PennyMac as part of her ongoing efforts to correct the accounting on the Loan:

> a.  The PennyMac representative instructed Becker that she owed a "total amount of $4,979.68" (including the improper late fee from April 16, 2018) for the June through August 2018 payments, despite Becker submitting payments for both June and July 2018.

> b.  Becker asked "what was the total amount that's due again" to which the representative replied with the same $4,979.68 number.

> c.  The representative further clarified that a payment of $2,882.04, plus the payment of the improper late fee, would satisfy the amounts due through June and July 2018.

> d.  The representative also informed Becker that PennyMac sent a notice of intent to foreclose on the Home on July 26, 2018.

43.     On August 10, 2018, Becker made a payment of $4,980.00 as instructed by the PennyMac representative.

44.     On August 31, 2018, Becker contacted PennyMac to confirm that PennyMac corrected the accounting on the Loan:

> a.  The representative named "Wensus" stated that Becker's account "didn't look right".

b. "Wensus" claimed that he "figured out how to get this adjusted" for Becker and *he* decided to apply Becker's $4,980.00 payment to her escrow account.

c. When Becker asked if that would make her current, "Wensus" stated that Becker would still owe for June, July, and August 2018.

d. "Wensus" continued by noting that he was having difficulty tracking prior payments and he agreed with Becker's statement that "that doesn't make sense" by responding with "yeah, that's what I've been trying to figure out".

e. Becker explained that every time she had called PennyMac, a different representative would give her different advice and, despite her trying to fix the problem, her credit was being negatively affected.

f. "Wensus" expressed that he "wished that they would make more pure notes".

g. "Wensus" agreed with Becker that she should be current with her payments towards principal and interest because she made every monthly payment.

h. "Wensus" concluded the call by saying that "we're going to get this straightened out…this has gone on long enough…this is going to be straightened out right now."

45. On September 5, 2018, Becker once again contacted PennyMac as part of her ongoing efforts to correct the accounting on the Loan:

a. A representative named "Theresa" stated that Becker was now due for four monthly payments with a total amount due of $2,288.74.

b. "Theresa" transferred Becker to another representative named "Clay" who could not tell her what happened with her escrow account because the "setting" was not working.

8

c. "Clay" told Becker that she "should be caught up" but "it shows on the account that things are behind" because PennyMac was still working on fixing the accounting.

d. "Clay" claimed that PennyMac representatives are not following up with Becker because the tasks have not been completed or they are not "keeping [her] in the loop".

e. "Clay" ended the call by stating that his manager claims that Becker "should be current" on September 6, 2018.

46. On September 7, 2018, "Clay" called Becker on September 7, 2018 and left a message requesting that she contact him.

47. On September 10, 2018, Becker contacted PennyMac as part of her ongoing efforts to correct the accounting on the Loan:

a. Becker reached "Darion", who stated that Becker was now due for four monthly payments with a total amount due of $7,268.74.

b. "Darion" also informed Becker that PennyMac sent another notice of intent to foreclose on the Home on September 6, 2018.

c. Another representative, "Shena", changed Becker's payment to $1,951.50 during the telephone call.

d. "Shena" stated that she cannot view PennyMac's records for other departments and vice versa because they are not authorized to view each other's systems.

e. Becker was transferred to "Stephanie" who claimed that a representative named "Clay" did not exist.

    f.   "Stephanie" claimed that PennyMac was trying to modify the Loan and Becker "already updated [her] financials".

    g.   Becker informed "Stephanie" that she did not provide financial information but instead was trying to correct the accounting on the Loan.

    h.   "Stephanie" could not explain how Becker was further behind at the time, even though she paid $4,980.00 in August.

    i.   "Stephanie" falsely stated that Becker's payments were going to "previous months owed" when instead PennyMac improperly applied the April 2018 payment and never fully corrected the error.

    j.   "Stephanie" claimed that PennyMac reapplied previous payments to Becker's escrow account so her payment "did not skyrocket up".

    k.   Becker informed "Stephanie" that she did not request that her previous mortgage payments be reapplied in this manner.

    l.   Becker reiterated that she asked on August 5, 2018 for the amount she owed to be completely current and a representative told her $4,979.68 would bring her account current.

48.    On or about December 10, 2018, PennyMac sent a Reinstatement Quote to Becker demanding $6,583.78 in order to bring the Loan current. A copy of the Reinstatement Quote is attached as **Exhibit 7**.

49.    On May 24, 2019, Becker, through counsel, sent a notice of error (the "NOE") to PennyMac at the address designated by PennyMac for receipt of requests for information pursuant to 12 C.F.R. § 1024.36(b) and notices of error pursuant to 12 C.F.R. § 1024.35(c) (the "Designated Address") via Certified Mail. A copy of the NOE without supporting enclosures and tracking

information evidencing delivery of the NOE from the website for the USPS's website (www.usps.com) is attached as **Exhibit 8**.

50.     Through the NOE, Becker claimed that PennyMac failed to bring Becker current after receipt of the $4,980.00 in August 2018 and imposed improper fees on the Loan. See Exhibit 8.

51.     On July 11, 2019, PennyMac sent a response to the NOE (the "Response") wherein PennyMac admits that "Ms. Stitsinger contacted our Collections Department who informed her that the total amount due to bring the account current was $4,979.68." A copy of the Response without supporting enclosures is attached as **Exhibit 9**.

52.     The Response falsely states that Becker called PennyMac on August 31, 2018 and "requested that the funds of $4,980.00 that were applied to her monthly payments, be reversed and reapplied to her escrow account." See Exhibit 9.

53.     The Response falsely states that Becker called PennyMac on September 7, 2018. See id.

54.     The Response admits that there was an "internal processing error". See id.

55.     The Response fails to address PennyMac's actions in turning an escrow shortage, that was not caused by any action of Becker, into a three month delinquency. See id.

56.     Despite acknowledging that PennyMac informed Becker that $4,979.68 would bring her account current, PennyMac confusingly insisted that no error had occurred. See id.

57.     As a result of receiving the confusing Response, on November 14, 2019, Becker, through counsel, sent a request for information requesting information relating to the Loan, specifically any call recordings and servicing notes related to Becker's August and September 2018 telephone calls, to PennyMac at the Designated Address via Certified Mail (the "RFI"). A

copy of the RFI without supporting enclosures and tracking information evidencing delivery of the RFI from the USPS's website (www.usps.com) is attached as **Exhibit 10**.

58.     As of January 31, 2020, PennyMac is still claiming that Becker is two months behind and, on information and belief, PennyMac continues to assess property inspection and other charges to the Loan.

## IMPACT AND DAMAGE TO PLAINTIFFS

59.     Despite Becker submitting a mortgage payment every month and PennyMac purportedly disbursing two escrow refund checks, Becker's escrow account was underfunded.

60.     PennyMac delayed notifying Becker of the change in property taxes for nine months instead of timely informing Becker that she owed an additional $2,819.35 to repay PennyMac's escrow advance, an amount less than what PennyMac refunded to Becker PennyMac's inaction allowed the escrow deficit to grow into an unmanageable number

61.     PennyMac failed to explain to Becker what caused her escrow account to be underfunded instead of timely working with Becker to fund the escrow account.

62.     PennyMac received Becker's April 2018 payment early and misapplied the payment to the escrow account and manufactured a significant default on the Loan.

63.     Becker repeatedly contacted PennyMac trying to correct her account. PennyMac told Becker that the August 2018 payment would bring her current and PennyMac subjected her to many futile telephone conversations where she received conflicting and incomplete information. In a month's time, Becker owed nearly $3,000.00 more than she did in August 2018, despite making the large August 2018 payment.

64.     PennyMac simultaneously moved towards foreclosure while claiming that it was trying to fix the accounting on the Loan, frustrating Becker more and more each step of the way.

65.     PennyMac's actions directly and proximately caused the following actual damages to Becker:

    a.  The Loan was assessed and continues to be assessed improper fees and/or charges;

    b.  PennyMac has furnished negative credit information;

    c.  Becker had to retain and pay legal counsel to submit the NOE and the RFI to PennyMac, pay postage costs for the mailing of the NOE and RFI, and pay legal counsel to review the responses to the NOE and RFI; and,

    d.  Becker suffered extreme emotional distress directly and proximately caused by PennyMac's actions in manufacturing a delinquency after mismanaging Becker's escrow account, subjecting Becker to many frustrating, contradictory, and futile telephone conversations with PennyMac, failing to correct errors, and instructing agents to visit the Home to take pictures and personally engage with Becker to ask questions. PennyMac's actions have caused Becker to justifiably worry that the Home may imminently be subject to foreclosure. Becker's extreme emotional distress has resulted in loss of sleep, anxiety, depression, and other significant emotional distress.

66.     PennyMac's negative credit reporting has damaged Stitsinger as he has lost out on opportunities to finance purchases and instead has had to use his retirement savings in order to make those purchases. Stitsinger has also suffered damages in the form of the improper fees and/or charges assessed to the Loan for which he is ultimately responsible as co-signer.

67.     Throughout this entire ordeal, Becker has simply wanted to be able to make timely, proper payments on the Loan and, more importantly, remain in the Home without fear of improper fees and foreclosure.

## PATTERN AND PRACTICE OF REGULATION X VIOLATIONS BY PENNYMAC

68.     PennyMac's actions are part of a pattern and practice of behavior in violation of Becker's rights and in abdication and contravention of PennyMac's obligations under the mortgage servicing regulations set forth in Regulation X of RESPA.

69.     At the time of the filing of this Complaint, PennyMac has had Four Hundred Seventy-Two (472) consumer complaints lodged against it nationally, specifically concerning the issue identified on the CFPB's consumer complaint database as "loan modification, collection, foreclosure" related to mortgages. Each such complaint is filed and cataloged in the CFPB's publicly accessible online database. (http://www.consumerfinance.gov/complaint database/).

70.     At the time of the filing of this Complaint, PennyMac has had Five Hundred Seventy-Four (574) consumer complaints lodged against it nationally, specifically concerning the issue identified on the CFPB's consumer complaint database as "loan servicing, payments, escrow account" related to mortgages. Each such complaint is filed and cataloged in the CFPB's publicly accessible online database. (http://www.consumerfinance.gov/complaint database/).

71.     Becker has reviewed the CFPB's consumer complaint database and has identified other similar alleged RESPA violations by PennyMac against other borrowers. In particular, Becker has reviewed the fifteen (15) consumer complaints attached hereto and identified as **Group Exhibit 11**. The date, details, and a narrative disclosed by the consumer is set forth in each complaint. The complaints show conduct which demonstrates that PennyMac has engaged in a pattern or practice of violating RESPA with respect to other borrowers.

## COUNT ONE: ON BEHALF OF BECKER ONLY
**VIOLATIONS OF RESPA, 12 C.F.R. § 1024.35(e) AND 12 U.S.C. § 2605(k)**

**(Failure to perform a reasonable investigation into the errors asserted by a notice of error)**

72.     Plaintiffs restate and incorporate all their statements and allegations contained in paragraphs 1 through 71, in their entirety, as if fully rewritten.

73.     12 C.F.R. § 1024.35(a) provides that "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

74.     Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. § 1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower."

75.     12 C.F.R. § 1024.35(e)(1) provides:

(i)    **In general.** Except as provided in paragraphs (f) and (g) of this section, a servicer must respond to a notice of error by either:

(A)   Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

(B)   Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

(ii) **Different or additional error.** If during a reasonable investigation of a notice of error, a servicer concludes that errors occurred other than, or in addition to, the error or errors alleged by the borrower, the servicer shall correct all such additional errors and provide the borrower with a written notification that describes the errors the servicer identified, the action taken to correct the errors, the effective date of the correction, and contact information, including a telephone number, for further assistance.

76.     "A servicer of a federally related mortgage shall not … fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." 12 U.S.C. § 2605(k)(1)(C).

77.     Standard servicer duties are those "typically undertaken by servicers in the ordinary course of business" and include the duties to "monitor tax delinquencies" and "work with ... borrowers on options to mitigate losses for defaulted mortgage loans." 78 F.R. 10696, 10739.

78.     "A servicer of a federally related mortgage shall not … fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. § 2605(k)(1)(E).

79.     The NOE meets the requirements of a notice of error as defined by 12 C.F.R. § 1024.35(a) because it contains Becker's name, loan number, property address, and states the errors Becker believes to have occurred. See Exhibit 8.

80.     Through the NOE, Becker alleged that PennyMac committed numerous covered errors, including errors pursuant to:

    a. 12 C.F.R. § 1024.35(b)(11) for failing to deem Becker current after she paid the August 2018 payment;

      b.   12 C.F.R. § 1024.35(b)(5) for imposing fees for which PennyMac had no reasonable basis to impose.

See id.

81.    Becker sent the NOE to PennyMac at the Designated Address and PennyMac received the same at the Designated Address. See id.

82.    The Response indicates that PennyMac did not perform a reasonable investigation into the errors asserted by the NOE, as the Response admits that PennyMac's Collections Department informed Becker that "the total amount due to bring the account current was $4,979.68" yet PennyMac claims that there was no error and refused to waive the fees on Becker's account. See Exhibit 9.

83.    PennyMac's investigation could not have been reasonable as the false statements and/or misrepresentations made in the Response conflict with recordings of Becker's telephone conversations with PennyMac's representatives.

84.    PennyMac's actions caused Becker to suffer actual damages, specifically:

      a.   The Loan continues to be assessed improper fees and/or charges;

      b.   PennyMac continues to furnish negative credit information;

      c.   Becker had to retain and pay legal counsel to submit the NOE and the RFI to PennyMac, pay postage costs for the mailing of the NOE and RFI, and pay legal counsel to review the responses to the NOE and RFI; and,

      d.   Becker continues to suffer extreme emotional distress directly and proximately caused by PennyMac's actions in moving towards foreclosing on the Home. Becker's extreme emotional distress has resulted in loss of sleep, anxiety, depression, and other significant emotional distress.

85.     PennyMac's failure to respond to, correct, or properly investigate the errors alleged through the NOE constitutes numerous distinct violations of 12 C.F.R. § 1024.35(e) and 12 U.S.C. §§ 2605(k)(1)(C) and (E).

86.     PennyMac's actions are believed to be part of a pattern and practice of behavior in conscious disregard for Becker's rights and in abdication of its obligations and duties under RESPA and Regulation X.

87.     As a result of PennyMac's actions, PennyMac is liable to Becker for actual damages and statutory damages. 12 U.S.C. § 2605(f)(1).

88.     Additionally, Becker requests reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

<u>**COUNT TWO: ON BEHALF OF ALL PLAINTIFFS**</u>
**BREACH OF CONTRACT**

89.     Plaintiffs restate and incorporate all their statements and allegations contained in paragraphs 1 through 71, in their entirety, as if fully rewritten.

90.     The Loan is an enforceable contract between PennyMac and Plaintiffs. <u>See ¶ 17 and Exhibit 1</u>.

91.     Based on Paragraph 2 of the Mortgage, PennyMac had an obligation to properly apply all funds when tendered to the balances owed to the interest, principal, escrow, late fees, and then any other corporate advances due on the Loan. These funds have not been properly credited which led to the improper declaration of default of the Loan. <u>See Exhibit 1</u>.

92.     PennyMac breached the Loan by failing to honor its terms, specifically by failing to properly apply payments made by Becker in accordance with the terms of the Loan, assessing improper fees to the Loan, and manufacturing a default on the principal and interest payments.

93.     Plaintiffs, through Becker's actions, have attempted to fully perform their obligations pursuant to the Loan by making a mortgage payment every month and diligently working with PennyMac to correct the escrow issues. Becker paid $4,979.68 on the Loan as instructed by PennyMac to become current on the Loan and PennyMac failed to bring the Loan current and demanded additional funds.

94.     PennyMac's breach is one of bad faith as demonstrated by the phone conversations between Becker and PennyMac's representatives and PennyMac's subsequent misrepresentation of those conversations through the Response. Becker repeatedly attempted to discover what caused the escrow issues and correct those issues. PennyMac's representatives consistently communicated inaccurate and incomplete information. When Becker finally received an answer on how much she owed and why, she made that payment in August 2018. Instead of correcting the accounting on the Loan, PennyMac insisted that Becker owed additional sums.

95.     PennyMac owed Plaintiffs an implied duty of good faith to handle the payments made by Becker properly and in accordance with the Loan. PennyMac breached its duty by failing to apply payments made by Becker in accordance with the terms of the Loan and taking Becker's payments towards principal and interest and applying them towards the indeterminable and everlasting negative escrow balance.

96.     PennyMac's actions caused Becker to suffer actual damages, specifically:

   a.   The Loan was and continues to be assessed improper fees and/or charges;

   b.   PennyMac continues to furnish negative credit information; and

   c.   Becker had to retain and pay legal counsel to submit the NOE and the RFI to PennyMac, pay postage costs for the mailing of the NOE and RFI, and pay legal counsel to review the responses to the NOE and RFI.

97.     PennyMac's negative credit reporting has damaged Stitsinger as he has lost out on opportunities to finance purchases and instead has had to use his retirement savings in order to make those purchases. Stitsinger has also suffered damages in the form of the improper fees and/or charges assessed to the Loan.

98.     As a result of PennyMac's actions, PennyMac is liable to Plaintiffs for actual damages and attorneys' fees and costs.

## COUNT THREE: ON BEHALF OF ALL PLAINTIFFS
## VIOLATIONS OF THE CSPA, R.C. 1345.01, *et seq.*

99.     Plaintiffs restate and incorporate all their statements and allegations contained in paragraphs 1 through 71, in their entirety, as if fully rewritten.

100.    R.C. 1345.01(A) defines "consumer transaction" as "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things."

101.    A "consumer transaction" includes "transactions in connection with residential mortgages between loan officers, mortgage brokers, or nonbank mortgage lenders and their customers." R.C. 1345.01(A).

102.    The Loan signifies a contractual relationship between PennyMac and Plaintiffs. See ¶ 17 and Exhibit 1.

103.    PennyMac is a nonbank mortgage lender licensed by the Ohio Department of Commerce, Division of Financial Institutions under R.C. 1322.01, *et seq.* as License Nos. RM.850062.005-BR,      RM.850062.006-BR,      RM.850062.008-BR,      RM.850062.009-BR, RM.850062.011-BR, RM.850062.012-BR. R.C. 1345.01(K).

104.    PennyMac and Plaintiffs engaged in multiple "consumer transactions" when PennyMac collected Plaintiffs' monthly mortgage payments. R.C. 1345.01(A).

105.    PennyMac is a "supplier" as it is a nonbank mortgage lender that engages in "consumer transactions" in connection with a residential mortgage. R.C. 1345.01(C).

106.    Plaintiffs are each a "consumer" as they engaged in "consumer transactions" with PennyMac. R.C. 1345.01(D).

107.    "The [CSPA] covers transactions in connection with a residential mortgage loan between nonbank lenders and their customers whether that interaction occurs before, during, or after the transaction." *Powers v. Green Tree Servicing, L.L.C.*, 8th Dist. Cuyahoga No. 102753, 2015-Ohio-3355, at ¶ 15.

108.    R.C. 1345.02(A) provides that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."

109.    R.C. 1345.031(A) provides that "[n]o supplier shall commit an unconscionable act or practice concerning a consumer transaction in connection with the origination of a residential mortgage. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."

110.    Ohio Courts have determined that the actions of a supplier in failing to correct errors in the accounting of a mortgage loan and failing to properly investigate borrowers' requests to correct errors constitute unfair or deceptive acts or practices. *See Marias v. Chase Home Finance, LLC*, PIF No. 10003211 (June 6, 2014). A copy of PIF No. 10003211 is attached as

**Exhibit 12**. The Ohio Attorney General has made this determination available for public inspection pursuant to R.C. 1345.05(A)(3).

111.    PennyMac's conduct in failing to properly apply Plaintiffs' mortgage payments, pursuing foreclosure on the Home, furnishing negative credit information, and failing to correct the accounting on the Loan after receipt of the NOE constitutes unfair and deceptive acts or practices under R.C. 1345.02(A) and R.C. 1345.031(A).

112.    PennyMac is also liable under the RMLA, R.C. 1345.40(I), *infra*, for its unfair and deceptive acts or practices in violation of the CSPA.

113.    PennyMac's actions caused Becker to suffer actual damages, specifically:

    a.    The Loan has been assessed improper fees and/or charges;

    b.    PennyMac has furnished negative credit information;

    c.    Becker had to retain and pay legal counsel to submit the NOE and the RFI to PennyMac, pay postage costs for the mailing of the NOE and RFI, and pay legal counsel to review the responses to the NOE and RFI; and,

    d.    Becker suffered extreme emotional distress directly and proximately caused by PennyMac's actions driven by the fear that the Home may be subject to foreclosure. Becker's extreme emotional distress has resulted in loss of sleep, anxiety, depression, and other significant emotional distress.

114.    PennyMac's negative credit reporting has damaged Stitsinger as he has lost out on opportunities to finance purchases and instead has had to use his retirement savings in order to make those purchases. Stitsinger has also suffered damages in the form of the improper fees and/or charges assessed to the Loan.

115. As a result of PennyMac's actions, PennyMac is liable to Plaintiffs for actual damages, statutory damages, non-economic damages of up to Five Thousand Dollars ($5,000.00), treble damages, costs, and attorneys' fees pursuant to R.C. 1345.09.

## COUNT FOUR: ON BEHALF OF ALL PLAINTIFFS
### VIOLATIONS OF THE RMLA, R.C. 1322.40

116. Plaintiffs restate and incorporate all their statements and allegations contained in paragraphs 1 through 71, in their entirety, as if fully rewritten.

117. PennyMac is a nonbank mortgage lender licensed by the Ohio Department of Commerce, Division of Financial Institutions under R.C. 1322.01, *et seq.* as License Nos. RM.850062.005-BR, RM.850062.006-BR, RM.850062.008-BR, RM.850062.009-BR, RM.850062.011-BR, RM.850062.012-BR. R.C. 1345.01(K).

118. The Loan signifies a contractual relationship between PennyMac and Plaintiffs. See ¶ 17 and Exhibit 1.

119. A registrant, licensee, or person required to be registered or licensed cannot:

    (B) Make false or misleading statements of a material fact, omissions of statements required by state or federal law, or false promises regarding a material fact, through advertising or other means, or engage in a continued course of misrepresentations;

    (C) Engage in conduct that constitutes improper, fraudulent, or dishonest dealings;

                               [....]

    (I) Engage in any unfair, deceptive, or unconscionable act or practice prohibited [by the CSPA].

R.C. 1322.40.

120. PennyMac, through its telephone communications with Becker and through the Response, has engaged in a continued course of misrepresentations by making false or misleading statements of a material fact and false promises regarding a material fact. R.C. 1322.40(B).

121. PennyMac's conduct in assessing improper fees to the Loan constitutes violations of R.C. 1322.40(C).

122. PennyMac's actions in instructing Becker that $4,979.68 would make her current, accepting that payment, demanding additional money, and failing to correct the accounting after receipt of the NOE constitute violations of R.C. 1322.40(C).

123. PennyMac's violations of the CSPA constitute violations of R.C. 1322.40(I)

124. PennyMac's actions caused Becker to suffer actual damages, specifically:

   a. The Loan has been assessed improper fees and/or charges;

   b. PennyMac has furnished negative credit information;

   c. Becker had to retain and pay legal counsel to submit the NOE and the RFI to PennyMac, pay postage costs for the mailing of the NOE and RFI, and pay legal counsel to review the responses to the NOE and RFI; and,

   d. Becker suffered extreme emotional distress directly and proximately caused by PennyMac's actions driven by the fear that the Home may be subject to foreclosure. Becker's extreme emotional distress has resulted in loss of sleep, anxiety, depression, and other significant emotional distress.

125. PennyMac's negative credit reporting has damaged Stitsinger as he has lost out on opportunities to finance purchases and instead has had to use his retirement savings in order to make those purchases. Stitsinger has also suffered damages in the form of the improper fees and/or charges assessed to the Loan.

126. As a result of PennyMac's actions, PennyMac is liable to Plaintiffs for actual damages in an amount not less than all compensation paid directly or indirectly to PennyMac, costs, attorneys' fees, and punitive damages pursuant to R.C. 1322.52.

## COUNT FIVE: ON BEHALF OF ALL PLAINTIFFS
### VIOLATIONS OF THE RMLA, R.C. 1322.45

127.    Plaintiffs restate and incorporate all their statements and allegations contained in paragraphs 1 through 71, in their entirety, as if fully rewritten.

128.    PennyMac is a nonbank mortgage lender licensed by the Ohio Department of Commerce, Division of Financial Institutions under R.C. 1322.01, *et seq.* as License Nos. RM.850062.005-BR, RM.850062.006-BR, RM.850062.008-BR, RM.850062.009-BR, RM.850062.011-BR, RM.850062.012-BR. R.C. 1345.01(K).

129.    The Loan signifies a contractual relationship between PennyMac and Plaintiffs. See ¶ 17 and Exhibit 1.

130.    R.C. 1322.45(A) requires a registrant, licensee, or person required to be registered or licensed to:

      a.    Comply with all duties imposed by other statutes or common law;

      b.    Safeguard and account for any money handled;

      c.    Follow reasonable and lawful instructions;

      d.    Act with reasonable skill, care, and diligence

      e.    Act in good faith and with fair dealing.

      f.    These duties cannot be waived or modified. R.C. 1322.45(C).

131.    These duties and standards of care of R.C. 1322.45(A) cannot be waived or modified. R.C. 1322.45(C).

132.    The acts of PennyMac in misapplying Plaintiffs' monthly payments in order to allow PennyMac to move towards foreclosure of the Home and mismanaging the Loan's escrow account constitute violations of R.C. 1322.45(A)(1)-(4).

133.    The acts of PennyMac in breaching the Loan and failing to perform a reasonable investigation into the NOE and correct errors constitute violations of R.C. 1322.45(A).

134.    PennyMac's actions caused Becker to suffer actual damages, specifically:

a.   The Loan has been assessed improper fees and/or charges;

b.   PennyMac has furnished negative credit information;

c.   Becker had to retain and pay legal counsel to submit the NOE and the RFI to PennyMac, pay postage costs for the mailing of the NOE and RFI, and pay legal counsel to review the responses to the NOE and RFI; and,

d.   Becker suffered extreme emotional distress directly and proximately caused by PennyMac's actions driven by the fear that the Home may be subject to foreclosure. Becker's extreme emotional distress has resulted in loss of sleep, anxiety, depression, and other significant emotional distress.

135.    PennyMac's negative credit reporting has damaged Stitsinger as he has lost out on opportunities to finance purchases and instead has had to use his retirement savings in order to make those purchases. Stitsinger has also suffered damages in the form of the improper fees and/or charges assessed to the Loan.

136.    As a result of PennyMac's actions, PennyMac is liable to Plaintiffs for actual damages in an amount not less than all compensation paid directly or indirectly to PennyMac, costs, attorneys' fees, and punitive damages pursuant to R.C. 1322.45(D).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Kristen Becker f.k.a. Kristen Stitsinger and Frederick Stitsinger pray that this Court enter its order granting judgment against Defendant NewRez LLC d/b/a Shellpoint Mortgage Servicing for the following:

A.   Actual damages to Becker in an amount to be determined at trial for the allegations contained in Count One;

B.   Actual damages to Plaintiffs in an amount to be determined at trial for the allegations contained in Counts Two through Five;

C.   Statutory damages of Two Thousand Dollars ($2,000.00) to Becker per each violation contained in Count One;

D.   Statutory damages of at least Two Hundred Dollars ($200.00) to Plaintiffs for the allegations contained in Count Three;

E.   Non-economic damages to Plaintiffs of up to Five Thousand Dollars ($5,000.00) for the allegations contained in Count Three;

F.   Treble damages to Plaintiffs for the allegations contained in Count Three;

G.   Punitive damages to Plaintiffs for the allegations contained in Counts Four and Five;

H.   Costs and reasonable attorneys' fees to Plaintiffs as to all Counts; and,

I.   Such other relief which this Court may deem appropriate.

Respectfully submitted:

*/s/ Marc E. Dann*
Marc E. Dann (0039425)
Brian D. Flick (0081605)
Daniel M. Solar (0085632)
Michael A. Smith, Jr. (0097147)
**DANN LAW**
P.O. Box 6031040
Cleveland, OH 44103
Telephone: 216-373-0539
Facsimile: 216-373-0536
notices@dannlaw.com

*Counsel for Plaintiffs Kristen Becker and Frederick Stitsinger*

## <u>JURY DEMAND</u>

Plaintiffs hereby request a trial by jury on all issues, with the maximum number of jurors permitted by law.

/s/ Marc E. Dann
Marc E. Dann (0039425)
Brian D. Flick (0081605)
Daniel M. Solar (0085632)
Michael A. Smith, Jr. (0097147)
**DANN LAW**

*Counsel for Plaintiffs Kristen Becker and Frederick Stitsinger*