UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KRISTEN BECKER f.k.a. KRISTEN
STITSINGER, et al.,

      Plaintiffs,

                              Case No. 1:20–cv–346
     v.                       JUDGE DOUGLAS R. COLE

PENNYMAC LOAN SERVICES, LLC,

      Defendant.

## OPINION AND ORDER

In this case, Plaintiffs claim that their mortgage servicer (who may have also been an assignee), Defendant PennyMac Loan Services ("PennyMac"), gave them incorrect information about their residential mortgage that resulted in harm to them. Based on what they describe as their "frustrating experience" with PennyMac over a multi-year period, they brought a five-count Complaint (Doc. 1). PennyMac responded with a Motion to Dismiss all five counts (Doc. 6). That Motion is now before the Court. For the reasons explained below, the Court **DENIES** PennyMac's Motion (Doc. 6).

## BACKGROUND

On February 6, 2015, Kristen Becker ("Becker"), with the other Plaintiff, Frederick Stitsinger, acting as co-signer, entered a mortgage on her home with non-party NVR Mortgage Finance, Inc. ("NVR"). (*See* Compl., Doc. 1, #3[1]). The mortgage

---

[1] Refers to PAGEID #.

had a principal amount of $244,064.00. (*See* Compl. Ex. 1, Doc. 1-1, #30).[2] Shortly after Plaintiffs executed the mortgage, PennyMac sent them a notice indicating that PennyMac would begin servicing the loan as of April 1, 2015. (Compl., Doc. 1, #4). (The Complaint is somewhat ambiguous about whether NVR had also assigned the mortgage to PennyMac. One paragraph states that "[n]on-party Federal Home Loan Mortgage Corporation is the current owner of the Loan," suggesting that, at least currently, PennyMac is not an assignee. (*Id*. at #2). But a later paragraph alleges that "NVR assigned the Mortgage to PennyMac on February 15, 2019," (*id*. at #4), and the loan documents attached to the Complaint seem to suggest that is the case, (*see* Compl. Ex. 1, Doc. 1-1, #54 (labeled "Assignment of Mortgage," naming "PennyMac Loan Services, LLC" as assignee)).)

In the mortgage documents, Plaintiffs agreed that they would pay property taxes and hazard insurance for the home through an escrow account that the mortgage servicer maintained. (Compl., Doc. 1, #3–4). At the time the mortgage originated, NVR indicated that the initial monthly combined mortgage/escrow payment would be $1,691.80. (*Id*. at #4). Plaintiffs allege that, starting in April 2015, and continuing to the date they filed the Complaint, they made monthly payments to PennyMac (who was now, at the very least, the loan servicer). (*Id*.). Indeed, between August 2016 and January 2018, Becker maintains that she paid more than her scheduled amount. (*Id*.).

---

[2] As this case is before the Court on a motion to dismiss, the Court takes the facts here from the Complaint. The Court takes these facts as true for purposes of the instant motion.

It appears that, in or about June 2015, some confusion began to arise surrounding the property taxes due on the property. More specifically, in late May, PennyMac contacted the Hamilton County Auditor's office to confirm that the Initial Escrow Account Disclosure Statement that NVR had prepared correctly stated the amount that would be due in June 2015. (*Id.*). The Hamilton County Auditor's office, though, said that the taxes on the property were already current, and that no June 2015 payment was needed. (*Id.*). Then, on January 7, 2016, PennyMac paid only $552.40, rather than the $1,284.55 that the Disclosure Statement had said would be due. (*Id.*).

Because the mortgage included an escrow requirement, and because escrow expenses (such as insurance or property taxes) can change over time, PennyMac informed Plaintiffs that "at least once a year," PennyMac would "review[] [the] escrow account to make sure there is enough money to pay your property taxes and/or insurance premiums." (Feb. 14, 2018 Disclosure, Compl. Ex. 4, Doc. 1-4, #69). Upon completing such a review, PennyMac also provides mortgagees with a statement that "informs [the mortgagee] of any adjustments to [the] monthly payment," reflects the current value of the mortgagee's escrow account, and shows how much money the mortgagee will need in the next twelve months. (*Id.*).

Because the property tax payments during 2015 were less than expected under the Initial Disclosure Statement, the February 2016 updated disclosure statement revealed a surplus in the escrow account of $1,964.48. PennyMac sent Becker a check for that amount. (Compl., Doc. 1, #5).

During 2016, the reported property tax charges remained lower than PennyMac expected. Accordingly, in February 2017, PennyMac again sent Becker a check refunding the $1,848.67 surplus in the escrow account. (*Id.*).

The wheels began to fall off shortly thereafter. In May 2017, the Auditor gave notice to PennyMac that PennyMac had underpaid the property taxes for the previous years. (*Id.*). That led to PennyMac paying $2,819.35 to the Auditor for the previous shortfall. (*Id.*). PennyMac also increased the payments it made for property taxes in 2017 on a going forward basis. As a result, by year end, the escrow account had a severe shortfall. More specifically, the February 2018 Escrow Account Disclosure Statement showed that Becker's escrow account was short some $7,035.66. (*Id.* at #6; Feb. 14, 2018 Disclosure, Compl. Ex. 4, Doc. 1-4, #71).

The escrow shortfall caused continued confusion regarding how Becker's monthly payments would apply among her various mortgage and escrow obligations. As a result of the shortfall, in February 2018, PennyMac raised Becker's monthly payment by almost $1,000. (Compl., Doc. 1, #6). But when Becker made her next payment, PennyMac applied the entire amount to the escrow account instead of distributing it among the principal, interest, and escrow, as Becker contends PennyMac should have done. (*Id.*). As a result, PennyMac assessed Becker a late fee for failure to make a principal payment. (*Id.*). And, because PennyMac considered Becker late on her mortgage payments, it also sent her a Notice of Default on July 26, 2018. (*Id.* at #6–7).

4

Becker alleges that she made repeated attempts to correct these "accounting errors" by contacting PennyMac representatives. (*Id.* at #6, 7–10). When these attempts failed, Becker sent PennyMac a Notice of Error ("NOE"). (*Id.* at #10). Although PennyMac responded, Becker found the response "confusing" and alleges that it failed to address PennyMac's actions regarding the escrow account. (*Id.* at #11).

## PENDING MOTION

PennyMac has now moved to dismiss the action under Rule 12(b)(6). (Doc. 6). According to PennyMac, all five counts are legally defective. Count One, which asserts violations of the Real Estate Settlement Procedures Act ("RESPA") and Regulation X, fails for multiple reasons. As to RESPA, PennyMac argues that the only relevant duty that RESPA imposes is a duty to provide a statement of reasons why the servicer believes the account is correct, that Plaintiffs' own allegations show that PennyMac did so here, and that, in any event, Becker did not allege damages. (Def.'s Mem. in Supp. of Mot. to Dismiss ("Mem. in Supp."), Doc. 6-1, #209–11). As for Regulation X, PennyMac says that the regulation does not create a private right of action, and that, even if it did, the documentation attached to the Complaint shows that no violation occurred. (*Id.* at #206, 207).

As for the breach of contract claim (Count Two), PennyMac concedes that Plaintiffs have pled the existence of a contract, but claims they have not sufficiently pled any of the remaining elements of a contract claim. More specifically, PennyMac argues that: (1) the allegations show that plaintiffs themselves breached the contract;

(2) there are no allegations plausibly showing that PennyMac breached the contract; and (3) the fees to which plaintiffs refer are not "damages," as PennyMac was contractually entitled to charge them. (*Id.* at #212–13).

The Consumer Sales Practices Act ("CSPA") claim (Count Three) fails, according to PennyMac, for the simple reasons that (1) a mortgage loan servicer is not a "supplier" for purposes of the CSPA, and (2) servicing a residential mortgage loan is not a "consumer transaction" under the Act. (*Id.* at #214–15).

Finally, PennyMac argues that both of the Ohio Residential Mortgage Lender Act ("RMLA") claims (Counts Four and Five), fail for one reason. The RMLA applies, PennyMac says, to mortgage *brokers*, not mortgage *servicers*. As PennyMac is not alleged to be a mortgage broker, it cannot be liable under the Act. (*Id.* at #215–16).

## LEGAL STANDARD

At the motion to dismiss stage, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). "To survive a motion to dismiss, in other words, [Becker] must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id.* (citations omitted).

In making that assessment, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation omitted). That is true,

6

however, only as to factual allegations. The Court need not accept as true Plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Moreover, the well-pled facts must be sufficient to "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 546–47, such that the asserted claim is "plausible on its face," *Iqbal*, 556 U.S. at 678. Under the *Twombly/Iqbal* plausibility standard, courts play an important gatekeeper role, ensuring that claims meet a plausibility threshold before defendants are subjected to the potential rigors (and costs) of the discovery process. Discovery, after all, is not designed as a method by which a plaintiff discovers whether he has a claim, but rather a process for discovering evidence to substantiate plausibly-stated claims.

In making the plausibility determination, though, the Court is limited in what it can consider. In particular, as a general matter, the Court is limited to the Complaint, along with any documents attached thereto. That being said, the Court can also consider the documents that a defendant attaches to its motion, but only to the extent that those documents are referenced in the Complaint, or otherwise subject to judicial notice for some reason. *See Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings.") (citation omitted). Reliance on documents beyond those limited categories, though, would require the Court to treat the motion to dismiss as a motion for summary judgment, which in turn would require the Court to provide the plaintiff notice of the Court's intent to do so, along

7

with the opportunity for any discovery needed to respond. *See Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009) ("If the district court does consider evidence outside the complaint, 'it effectively converts the motion to dismiss to a motion for summary judgment.'") (citation omitted); *Armengau*, 7 F. App'x at 343 ("Because of the risk of prejudicial surprise arising from the court's treating a motion to dismiss as a motion for summary judgment, Rule 12(b) further requires notice and an opportunity to supplement the record before the court enters summary judgment.") (citations omitted).

## LAW AND ANALYSIS

PennyMac moves to dismiss all five counts of the Complaint. It addresses Counts Four and Five jointly, though, as both counts assert Residential Mortgage Lending Act claims, each of which PennyMac asserts is fatally flawed for the same reason. The Court thus addresses the counts in order, but treats Counts Four and Five collectively.

### A. Count One Pleads A Plausible Claim Under RESPA And Regulation X.

PennyMac mounts both legal and factual challenges to Count One, which asserts claims under both RESPA and Regulation X, a Consumer Financial Protection Bureau ("CFPB") regulation implemented under RESPA. The Court starts with the legal challenges, and then turns to the factual challenges.

1.      **Regulation X Gives Rise To A Private Right Of Action.**

PennyMac starts by claiming that Regulation X (or, at least, § 1024.35 thereof, which is the regulation relevant here) does not give rise to a private right of action. The Court disagrees.

The Court concedes that this issue has split courts to some degree. As PennyMac points out, at least some courts, including at least one district court in the Sixth Circuit, have held that Regulation X does not provide for a private cause of action. (Mem. in Supp., Doc. 6-1, #206–07 (citing cases)). The Sixth Circuit, however, has yet to offer guidance on the issue. And, in a carefully reasoned opinion, a magistrate judge in this district concluded, and the district court agreed, that there *is* such a private right. *Hazelwood v. Bayview Loan Servicing, LLC*, No. 1:20-CV-726, 2021 WL 664059, at \*5–8 (S.D. Ohio Feb. 19, 2021), report and recommendation adopted, No. 1:20-CV-726, 2021 WL 1019936 (S.D. Ohio Mar. 17, 2021). The Third Circuit arrived at the same result. *Lloyd v. New Jersey Hous. & Mortg. Fin. Agency*, 845 F. App'x 139, 144 (3d Cir. 2021) ("Congress has explicitly authorized a private right of action for a borrower to enforce RESPA and its regulations, including Regulation X, against a loan servicer."). And, as Plaintiffs note, the Eleventh Circuit reached that same answer a few years earlier. *Lage v. Ocwen Loan Servicing LLC*, 839 F.3d 1003, 1007 (11th Cir. 2016) ("If the servicer fails to respond adequately to the borrower's notice of error [as Regulation X requires], then the borrower has a private right of action to sue the servicer under RESPA.").

Given the *Bayview* Court's resolution of this legal issue, as well as the underlying reasoning outlined there, and in the absence of Sixth Circuit precedent to

the contrary, this Court likewise concludes the NOE regulations codified at § 1024.35 of Regulation X are enforceable by way of a private right of action under RESPA.

## 2. PennyMac's Legal Attack On The RESPA Claim Appears To Rely On The Incorrect Statutory Provision.

PennyMac likewise argues that Plaintiffs' RESPA claim, which PennyMac contends is based on 12 U.S.C. § 2605(e), fails as a matter of law. (*See* Mem. in Supp., Doc. 6-1, #208–09). The initial problem with that argument, as Plaintiffs point out, is that the Plaintiffs appear to be asserting a claim under 12 U.S.C. § 2605(k), not (e). (*See* Pl.s' Resp. in Opp'n to Def.'s Mot. to Dismiss ("Opp'n"), Doc. 8, #801 ("Becker does not bring a claim under 12 U.S.C. § 2605(e) and it is not certain why PennyMac devotes three paragraphs to arguing that it complied [with that subsection].")). At the very least, the former is the provision that the Complaint cites. (*See* Doc. 1, #15). Undaunted, in reply, PennyMac says that, notwithstanding how Plaintiffs *labeled* the claim, it must in fact be a claim under § 2605(e), as § 2605(k) would not apply on the facts here. (*See* Def.'s Reply Mem. in Supp. of Mot. to Dismiss ("Reply"), Doc. 9, #844–45). The Court is not convinced.

PennyMac's argument that § 2605(k)(1) cannot apply here proceeds as follows. According to PennyMac, while that statute forbids a servicer from engaging in a variety of conduct, the only conduct that potentially applies here is that a servicer may not "fail to 'take timely action to respond to a borrower's requests to [correct errors relating to] allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties.'" (*See id.* at #845 (quoting 12 U.S.C. § 2605(k)(1)(C))). And PennyMac alleges that the undisputed facts

10

show that it timely responded to Plaintiffs' NOE, and thus could not have violated that legal duty.

The Court will address the factual assertion regarding the NOE responses further below, but, as a legal matter, the Court observes that § 2605(k)(1)(E) also imposes another potentially relevant obligation. Namely, a servicer may not "fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. § 2605(k)(1)(E). One such obligation is set forth in Regulation X and, more specifically, 12 C.F.R. § 1024.35. Indeed, the *Bayview* Court specifically referred to § 2605(k)(1) as one of the statutes on which the CFPB relied in adopting that regulation. *Bayview*, 2021 WL 664059, at *7. And § 2605(f) creates a private right of action for violations of "this section," which would appear to include violations of § 2605(k)(1).

In sum, § 2605(k)(1), in combination with § 2605(f), provides Plaintiffs a valid legal basis for alleging that a violation of the obligations imposed by Regulation X gives rise to the potential for liability under RESPA. Thus, whether § 2605(e) does, or does not, provide such a cause of action is irrelevant.

### 3. PennyMac's Factual Challenges To The RESPA And Regulation X Claims Fail At The Motion To Dismiss Stage.

In addition to arguing that the RESPA and Regulation X claims lack any legal basis, PennyMac further contends that they are factually baseless. This is so, PennyMac claims, for essentially two reasons. First, Plaintiffs have failed to adequately allege that PennyMac did anything wrong. Second, Plaintiffs have failed

to adequately allege that they suffered damages. But, what PennyMac really appears to be arguing on this front, is that Plaintiffs' allegations are insufficient *in light of the clear import of the documents that PennyMac attaches to its motion*. Because the Court concludes that it cannot consider those documents at this stage, it rejects this argument.

PennyMac is certainly correct that Plaintiffs must plausibly allege that PennyMac violated an obligation it owed to Plaintiffs under RESPA. Plaintiffs have done so here. Under 12 C.F.R. § 1024.35, which is part of Regulation X, if a borrower submits a written NOE, the servicer must either correct the error, or conduct a "reasonable investigation" before informing the borrower that no error occurred. Plaintiffs then provide a litany of factual allegations detailing the ways in which they believe that errors occurred, and in which PennyMac failed to reasonably investigate. (*See* Compl., Doc. 1, #11, 17–18). That suffices to plausibly allege a claim.

PennyMac's principal argument to the contrary rests on its belief that its only obligation was to respond to Becker's NOE by providing some kind of reason, which it says that it did here. (*See* Reply, Doc. 9, #845 ("PLS timely responded to Becker's NOE. That is all that this specific subsection of RESPA requires.")). Two problems with that. First, as noted above, not just any reason will do. Rather, the reason must be the result of a "reasonable investigation." 12 C.F.R. § 1024.35(e)(1)(i)(B). Whether a given investigation was reasonable strikes the Court as an inquiry ill-suited to resolution at the motion to dismiss stage.

Second, PennyMac's claim that it provided a valid reason for finding no error rests on documents that are not attached to the Complaint. Rather, PennyMac supplied the documents along with its Motion to Dismiss. These documents include, for example, a detailed payment history reflecting PennyMac's accounting of every payment that it received from Plaintiffs, along with how those payments allegedly were allocated to various accounts (principal, interest, escrow, etc.). (*See* Mem. in Supp., Doc. 6-1, #207–08 (citing Doc. 7-18, #703–32)). The Court sees no basis for considering such documents in connection with a motion to dismiss.

In sum, PennyMac may well be correct that the documents show that it conducted a reasonable investigation, and that it supplied factually accurate information to Plaintiffs at every step of the way. But those are simply not issues that the Court can reach in resolving a motion to dismiss. Thus, the Court rejects PennyMac's argument that Plaintiffs failed to adequately allege that PennyMac did anything wrong.

Separately, PennyMac asserts that Plaintiffs failed to adequately allege damages. That argument starts on solid legal footing—a plaintiff must allege damages to proceed past the motion to dismiss stage. But Plaintiffs have done so here.

RESPA allows recovery of, among other things, "actual damages," 12 U.S.C. § 2605(f)(1), a term the statute does not define. In light of RESPA's remedial nature, though, the Sixth Circuit has given the term "generous treatment." *See Marais v. Chase Home Fin., LLC*, 24 F. Supp. 3d 712, 728 (S.D. Ohio 2014) (citing *Mellentine v. Ameriquest Mortg. Co.*, 515 F. App'x 419 (6th Cir. 2013), and *Houston v. U.S. Bank*

13

*Home Mortg. Wis. Servicing*, 505 F. App'x 543 (6th Cir. 2012)). The term extends to "all provable injuries" resulting from a servicer's inappropriate response to an NOE. *Id.* "Or, to put a finer point on it, all expenses, costs, fees, and injuries fairly attributable to [the servicer's] failure to respond appropriately to the QWR, even if incurred before the failure to respond, are included." *Id.*

Especially given the "generous" standard that applies to damages, the Complaint sufficiently alleges that Becker suffered damages here. Among other elements of potential damages, Becker claims that PennyMac's repeated failure to comply with RESPA resulted in Becker (1) paying improper late fees or charges due to PennyMac's accounting errors and the misrepresentations its agents allegedly made, and (2) paying legal fees for an attorney to assist with the NOE process. (*See* Compl., Doc. 1, #17). At least for pleading purposes, that suffices. *See, e.g.*, *Lanton v. Ocwen Loan Servicing, LLC*, 793 F. App'x 398, 401 (6th Cir. 2019) ("Moreover, this circuit has held that, under some circumstances, the cost of preparing a QWR that is inadequately responded to may sometimes constitute actual damages." (citing *Marais v. Chase Home Finance LLC*, 736 F.3d 711, 721 (6th Cir. 2013))).

PennyMac argues otherwise, but in doing so, again essentially asks this Court to determine—as a matter of fact, and at the motion to dismiss stage—that PennyMac did nothing wrong. For example, as to the allegedly improper late fees, PennyMac argues that they were not improper, as "such fees and charges were incurred pursuant to the express terms of the Mortgage." (Mem. in Supp., Doc. 6-1, #210). But, once again, PennyMac seeks to show that the fees were proper by reference to an

exhibit that PennyMac supplied—allegedly detailing Becker's payment history—that is neither part of the Complaint, nor, so far as the Court can tell, appropriately the subject of judicial notice. (*Id.* (citing Doc. 7-18)). And, as for the legal fees, PennyMac acknowledges that "costs can *become* actual damages when a servicer fails to adequately respond to the notice of error." (Reply, Doc. 9, #849). But it insists "[t]hat is not the case here," as "[t]he evidence is clear that PLS adequately responded to Plaintiffs' NOE." (*Id.* at #849–50). All of that may indeed be the case, but such determinations go far beyond the four corners of the Complaint—or any documents attached thereto—and thus are not proper at the motion to dismiss stage.

In sum, the Court concludes that, at least for pleading purposes, Plaintiffs have put forth a "plausible" RESPA and Regulation X claim. Accordingly, the Court **DENIES** the Motion to Dismiss as to Count One.

## B. The Court Declines To Dismiss Count Two, The Breach Of Contract Claim, As PennyMac's Argument Relies On Documents That The Court Cannot Consider At This Stage.

PennyMac likewise seeks dismissal of the contract claim. In particular, it argues that Becker failed to adequately plead (1) that she performed under the contract, (2) that PennyMac breached, or (3) that Becker suffered any damages. (Mem. in Supp., Doc. 6-1, #212–13). While the Court concedes that the Complaint's contract allegations are threadbare at best, PennyMac's efforts to show that it did not breach rely heavily on documents that are outside the pleadings. Because of the fact-intensive nature of PennyMac's arguments, the Court concludes that dismissal is not warranted.

Ohio law determines the elements of Becker's breach of contract claim. And Ohio law provides that, to plead "a cognizable claim for breach of contract, [a plaintiff is] required to allege the following: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damages." *Byers DiPaola Castle, L.L.C. v. Portage Cnty. Commrs.*, 41 N.E.3d 89, 94 (Ohio Ct. App. 2015). Because the case is in federal court, though, federal law controls the pleading standards. And, as noted above, federal law requires Becker to plead sufficient factual allegations to set forth a plausible claim in light of those state-law-created elements.

The first element is not a problem, as PennyMac concedes the existence of the contract. According to PennyMac, though, Becker has failed to plausibly allege the remaining three elements. PennyMac is certainly correct that the Complaint is a bit light on that front. For example, rather than alleging that Becker performed, the Complaint asserts that Becker has "attempted to fully perform," and that she has "diligently work[ed] with PennyMac to correct the escrow issues." (Doc. 1, #19). That could be read as almost a tacit admission of nonperformance. But, even so, a plaintiff's nonperformance under a contract relieves a defendant's obligation to perform only if the plaintiff's nonperformance is material. *Knisley v. Knauff*, No. 95CA559, 1996 WL 571484, at *2 (Ohio Ct. App. Oct. 2, 1996) ("It is black-letter law … that only a 'material' breach of a contract provisioned by one party will justify nonperformance by the other party." (quoting *Wagner v. Flo-lizer, Inc.*, No. 407, 1988 WL 38848, at *5 (Ohio Ct. App. Apr. 21, 1988))). And, based on the Complaint, and the documents attached to it, the Court cannot conclude that Plaintiffs' breach here,

16

if any, was material. *See id.* ("Moreover, the determination of 'materiality' is a complicated question of fact …." (quoting *Wagner*, 1988 WL 38848, at *5)). In short, Plaintiffs have offered enough as to their own performance, if barely, to satisfy the pleading standard regarding this element.

Turning to PennyMac's alleged breach, the allegations are again a bit thin. According to Becker, PennyMac "had an obligation to properly apply all funds," which it breached by "failing to properly apply [Becker's] payments." (Compl., Doc. 1, #18). But allegations that the-contract-required-X-and-you-didn't-do-X are almost the very definition of "conclusory." That being said, Count Two also incorporates the other allegations in the Complaint, and those allegations tell a somewhat more detailed factual story. These include extensive representations about various calls in which PennyMac representatives allegedly made statements to Becker about how the mortgage agreement operates, and how PennyMac would apply loan payments under it. (*See id.* at #7–10, 19). To be sure, PennyMac contends, based on its own documents, which it submitted as exhibits in support of its motion, that it did everything right under the contract. But a court's job at the dismissal stage does not extend to selecting between the parties' disputed versions of the facts. In short, whether and to what extent Becker breached, or PennyMac breached, appears to be a fact-intensive inquiry that the Court declines to resolve here.

Much the same is true as to PennyMac's argument that Becker failed to adequately allege damages. The damages, according to Becker, include being charged improper fees due to PennyMac's failure to properly credit her payments. (*Id.* at #19).

PennyMac's response again amounts to a version of "we did it correctly," as "proven" by the various "Loan Records" that PennyMac submitted, along with an affidavit from the "Foreclosure Operations Supervisor" walking through those documents and assuring the Court that PennyMac faithfully complied with the terms of its agreement with the Beckers. (*See generally* Doc. 7 (attaching nineteen exhibits that are allegedly business records)).[3] That may well be a winning argument on summary judgment, but the Court declines to accept it at this stage of the litigation. Accordingly, the Court **DENIES** the Motion to Dismiss as to Count Two, the breach of contract claim.

## C. Given The Allegations That PennyMac Did Not Act Solely As A Mortgage Servicer, Count Three States A Plausible CSPA Claim.

Turning to the CSPA claim, PennyMac contends that the claim fails as a matter of law for the simple reason that the CSPA does not cover mortgage loan servicers. In particular, according to PennyMac, servicers are not "suppliers" for purposes of the CSPA, nor is a residential mortgage loan a "consumer transaction"

---

[3] Although PennyMac did not mention it, it appears that nine of the documents that PennyMac submitted are duplicates, in whole or in part, of documents that *are* attached to the Complaint. (*Compare* Docs. 1-1, 1-2, 1-3, 1-4, 1-8, 1-9, *and* 1-10, *with* Docs. 7-1, 7-2, 7-3, 7-4, 7-5, 7-8, 7-12, 7-14, *and* 7-15). The documents are presented in a different order, though, and grouped differently (e.g., Docs. 7-2, 7-3 and 7-4 appear to be attached as a single exhibit to the Complaint, (*see* Doc. 1-1)). As the Court's ability on a motion to dismiss to consider attachments to the Complaint differs from its ability to consider attachments to the motion itself, it would have been helpful for PennyMac to note the overlap, and refer to the Complaint exhibits when possible. In any event, though, as part of its PennyMac-did-not-breach-the-contract argument, PennyMac relies on exhibits attached to its Motion to Dismiss that are *not* also attached to the Complaint. (*See* Doc. 6-1, #212–13 (citing Docs. 7-18 and 7-19)). These documents, which consist, for example, of letters that PennyMac claims it sent Becker, are not the type of documents of which this Court can take judicial notice, nor are they inherently part of Becker's cause of action. Thus, the Court declines to consider them at this stage.

under the Act. (Mem. in Supp., Doc. 6-1, #214). The Court concludes that PennyMac is correct in these legal assertions, but that this argument fails to justify dismissal—as it appears that PennyMac was not merely a mortgage servicer, but also an assignee on the note.

Ohio's Consumer Sales Practices Act imposes liability on any "supplier" who "commit[s] an unfair or deceptive act" in connection with a "consumer transaction." Ohio Rev. Code § 1345.02(A). As PennyMac notes, however, the Ohio Supreme Court, the ultimate arbiter of Ohio law, has expressly addressed whether mortgage servicers are "suppliers," and whether mortgage services constitute a "consumer transaction." That court answered both questions the same way—"No." *See Anderson v. Barclay's Capital Real Estate, Inc.*, 989 N.E.2d 997, 1002 (Ohio 2013). More specifically, in *Anderson*, the court addressed the following two questions on certification from a federal district court in the Northern District of Ohio:

1. Does the servicing of a borrower's residential mortgage loan constitute a "consumer transaction" as defined in the Ohio Consumer Sales Practices Act, R.C. [§] 1345.01(A)?

2. Are entities that service residential mortgage loans "suppliers … engaged in the business of effecting or soliciting consumer transactions" within the meaning of the Ohio Consumer Sales Practices Act, R.C. § 1345.01(C)?

*Id.* at 999.

As to the first question, the court observed that, while a mortgage servicer's duties "may involve direct and indirect interactions with borrowers on behalf of the financial institution," there is no actual "contract between the borrower and the mortgage servicer." *Id.* at 1000. According to the court, the lack of a contract means

that such interactions do not satisfy the language found in Ohio Rev. Code § 1345.01(A). *Id.* Rather, they are "collateral services" associated with real estate transactions, which fall outside the scope of the CSPA. *Id.* Further confirming that result, mortgage servicing arrangements do not result in the "transfer of an item of goods, a service, a franchise, or an intangible, to an individual." *Id.* at 1001 (quoting Ohio Rev. Code § 1345.01(A)). To be sure, the mortgage servicer is providing "services," but it is providing those services "to the owner of the mortgage and note," not to the borrower. *Id.* And the court found even further support for this result in court decisions from other states, and the General Assembly's amendments to the CSPA over the years. *See id.* at 1001–02.

The court reached a similar result on the "supplier" issue. "Suppliers," the court noted, are those who are "engaged in the business of effecting or soliciting consumer transactions." *Id.* at 1003 (quoting Ohio Rev. Code § 1345.01(C)). Given the court's determination on the consumer transaction issue, the court had "little trouble concluding that an entity that services a residential mortgage loan is not a 'supplier' as defined in R.C. 1345.01(C)." *Id.*

Perhaps not surprisingly, given the clarity with which the Ohio Supreme Court has spoken on this front, Becker largely concedes the legal issue. She contends, however, that the Complaint alleges that PennyMac is more than a mere servicer, but in fact is the "assignee" (i.e., the current owner) of the mortgage. (Opp'n, Doc. 8, #810–11).

This response starts on firm legal footing. While the Act does not apply to mortgage servicers, assignees are a different matter. *See Bucy v. Pennymac Loan Servs., LLC*, No. 2:15-CV-2909, 2016 WL 5719804, at *11 (S.D. Ohio Sept. 30, 2016) ("Moreover, the CSPA specifically provides for claims against 'an assignee or purchaser of a mortgage loan for value' when '(A) [t]he violation was committed by the assignee or purchaser.'").

PennyMac responds, though, by again asserting that the Complaint alleges only that PennyMac was a servicer. The Court is not convinced. To be sure, portions of the Complaint specify that "[n]on-party Federal Home Loan Mortgage Corporation is the current owner of the Loan," with the term "Loan" defined to mean the "Note" and the "Mortgage," collectively. (Doc. 1, #2). That could be read as suggesting that PennyMac was only a servicer, not an assignee.

On the other hand, paragraph 17 of the Complaint expressly avers that "NVR [the mortgage originator] assigned the Mortgage to PennyMac on February 15, 2019." (*Id.* at #4). That seems to cover it. On the other hand, PennyMac perhaps could argue that this allegation means only that NVR assigned the *servicing obligation*. But, while the allegation could—perhaps—be read that way, one of the documents that Becker attaches to the Complaint seems to suggest that the mortgage in fact was assigned to PennyMac. (*See* Compl. Ex. 1, Doc. 1-1, #54). And PennyMac apparently concedes that the document itself is valid, as PennyMac included the same document as an exhibit to its Motion to Dismiss. (*See* Doc. 7-4).

21

To be sure, the Court could perhaps be wrong in its understanding of this document (which is one of the reasons that the type of fact-based argument that PennyMac presses here is ill-suited to the dismissal stage). But the Court nonetheless concludes, at least for present purposes, that dismissal on the ground that PennyMac is not an assignee is not warranted on the current record. Accordingly, the Court **DENIES** the Motion to Dismiss as directed to Count Three, but without prejudice to PennyMac's right to re-raise the argument on a more fully developed factual record, if warranted.

### D. Becker States Plausible Claims Under The RMLA In Counts Four And Five.

In Counts Four and Five, Becker asserts claims under the Ohio Residential Mortgage Lender Act ("RMLA"). PennyMac argues that those claims should be dismissed, essentially for two reasons. First, PennyMac says, the RMLA does not apply to it as a mortgage servicer. (Mem. in Supp., Doc. 6-1, #216–17). Second, it says, the undisputed facts show it did not violate any duties under the Act. (Reply, Doc. 9, #854–56). The Court disagrees as to the former, and concludes that the latter is not appropriately decided at the motion to dismiss stage.

PennyMac's argument regarding the statutory scope misfires because the argument relies on a now superseded version of the statute. In particular, PennyMac argues that Becker is asserting claims under the Ohio Mortgage Broker's Act, apparently without realizing that the Ohio General Assembly amended that Act to make it the Residential Mortgage Lending Act. *See generally* Enact Ohio Residential Mortgage Lending Act, Sub. H.B. 199, 132d Gen. Assemb. (Ohio 2018). As part of

those amendments, the General Assembly saw fit to include mortgage servicers as an entity requiring registration. *See* Ohio Rev. Code § 1322.07(A)(1) (requiring a "mortgage servicer" to obtain certificate of registration). And, as Becker notes, the Act's prohibitions, which are set out at Ohio Rev. Code § 1322.40, apply to any "registrant, licensee, or person required to be registered or licensed under this chapter." That would include mortgage servicers such as PennyMac.

PennyMac fares no better on its fact-based argument. First, it says the Complaint alleges that PennyMac is a "nonbank mortgage lender," not a "mortgage servicer." (Reply, Doc. 9, #853). That may be the case in the language specifically directed at these two counts, but as PennyMac itself notes, at other points in the Complaint, Becker alleges that PennyMac serviced the mortgage. (*See, e.g.*, Doc. 1, #2). And, in any event, even if Becker fell a little short in specifying the exact category into which PennyMac falls, that does not require dismissal of the Complaint. The purpose of a Complaint is to put the defendant on notice of the claim against it, so that it may begin to prepare its defense. Here, the Complaint cites the statutory provision that PennyMac allegedly violated and discusses how that violation occurred. That suffices, even if the Complaint erroneously referred to PennyMac as a nonbank mortgage lender, rather than a mortgage servicer.

PennyMac's only remaining argument is to claim that the undisputed facts show that PennyMac properly applied all of the mortgage payments it received from Becker and did not make any false or misleading statements. But, as the Court has noted as to many of the other arguments that PennyMac presses, that is an argument

better hashed out on a fully developed factual record, rather than at the motion to dismiss stage. Thus, the Court **DENIES** the motion to dismiss these two counts, but without prejudice to PennyMac's right to raise the fact-based arguments again when appropriately developed.

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** PennyMac's Motion to Dismiss (Doc. 6).

  **SO ORDERED.**

February 1, 2022
_____

**DATE**

_____

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**